Filed 12/31/12

# IN THE SUPREME COURT OF CALIFORNIA

SMRITI NALWA,  )
  )
  Plaintiff and Appellant,  )
  )  S195031
  v.  )
  )  Ct.App. 6 H034535
CEDAR FAIR, L.P.,  )
  )  Santa Clara County
  Defendant and Respondent.  )  Super. Ct. No. CV089189
_____)

Plaintiff, who fractured her wrist on a bumper car ride at an amusement park, sued the park owner for negligence in not configuring or operating the bumper car ride so as to prevent her injury. The superior court granted summary judgment for defendant on the basis of the primary assumption of risk doctrine, under which participants in and operators of certain activities have no duty of ordinary care to protect other participants from risks inherent in the activity. (*Knight v. Jewett* (1992) 3 Cal.4th 296, 315-316.) The Court of Appeal, concluding the doctrine did not apply to bumper car rides, reversed.

We conclude the primary assumption of risk doctrine, though most frequently applied to sports, applies as well to certain other recreational activities including bumper car rides. We further conclude the doctrine applies to the ride here, even though amusement parks are subject to state safety regulations and even though, as to some rides, park owners owe participants the heightened duty of care of a common carrier for reward. (See *Gomez v. Superior Court* (2005) 35 Cal.4th

1

1125, 1141 [roller coasters and similar rides]). Finally, we hold defendant's limited duty of care under the primary assumption of risk doctrine—the duty not to unreasonably increase the risk of injury over and above that inherent in the low-speed collisions essential to bumper car rides—did not extend to preventing head-on collisions between the cars. We therefore reverse the Court of Appeal's judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

On July 5, 2005, plaintiff, Dr. Smriti Nalwa, took her nine-year-old son and six-year-old daughter to Great America amusement park, owned and operated by defendant Cedar Fair, L.P. In the afternoon, plaintiff and her children went on the park's Rue le Dodge bumper car ride.

The ride consisted of small, two-seat, electrically powered vehicles that moved around a flat surface. Each car was ringed with a rubber bumper and had a padded interior and seatbelts for both driver and passenger. The driver of each car controlled its steering and acceleration.

Plaintiff rode as a passenger in a bumper car her son drove, while her daughter drove a car by herself. Plaintiff's son steered while plaintiff sat next to him in the bumper car; they bumped into several other cars during the course of the ride. Toward the end of the ride, plaintiff's bumper car was bumped from the front and then from behind. Feeling a need to brace herself, plaintiff put her hand on the car's "dashboard." According to plaintiff's son, "something like cracked" and plaintiff cried out, "Oh." Plaintiff's wrist was fractured.

The Rue le Dodge ride was inspected annually for safety by the California Department of Industrial Relations, Division of Occupational Health and Safety, and was inspected every morning by defendant's maintenance and ride operations departments. On the morning of plaintiff's injury, it was found to be working normally. Fifty-five injuries were reported occurring on or around the Rue le

2

Dodge ride in 2004 and 2005, including contusions, lacerations, abrasions and strains. Plaintiff's was the only fracture reported.

Head-on bumping was prohibited on the Rue le Dodge ride, a safety rule the ride operators were to enforce by lecturing those they saw engaging in the practice and, if a guest persisted in head-on bumping, by stopping the ride and asking the person to leave. At the time of plaintiff's injury, defendant operated the bumper car rides at its four other amusement parks so that the cars could be driven in only one direction.

In her operative complaint, plaintiff pleaded causes of action for common carrier liability, willful misconduct, strict products liability (in two counts) and negligence, but later dismissed the two products liability counts. The trial court granted defendant's motion for summary judgment on the remaining causes of action, concluding the primary assumption of risk doctrine barred recovery for negligence because plaintiff's injury arose from being bumped, a risk inherent in the activity of riding bumper cars. The heightened duty of care for common carriers did not apply, the trial court found, because defendant had no control over the steering and orientation of the individual bumper cars, nor was there any willful misconduct as defendant did not act with knowledge or reckless disregard of a likely injury.

The Court of Appeal reversed in a divided decision, holding that the public policy of promoting safety at amusement parks precludes application of the primary assumption of risk doctrine, and the doctrine is inapplicable to bumper car rides in particular because that activity is "too benign" to be considered a "sport." Even if the doctrine applied to the Rue le Dodge ride, the court further reasoned, defendant could have reduced the ride's risks by configuring it to minimize head-on collisions. The dissenting justice argued the primary assumption of risk doctrine is not limited to those activities deemed "sports"; that its application to an

3

amusement park ride does not violate any discernable public policy; and that the risk of injury from any collision, including head-on bumping, is inherent in the activity of riding bumper cars.

We granted defendant's petition for review.

**DISCUSSION**

A motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A defendant "has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action . . . cannot be established . . . ." (*Id.*, subd. (p)(2).) Upon such a showing, "the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action . . . ." (*Ibid.*)

"On review of an order granting or denying summary judgment, we examine the facts presented to the trial court and determine their effect as a matter of law. . . . [D]efendant asserted, and the trial court found, that plaintiff's evidence failed to establish the 'duty' element of plaintiff's cause of action for negligence. Duty, being a question of law, is particularly amenable to resolution by summary judgment." (*Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 464-465.)

We must decide whether, as a matter of law and on the undisputed facts presented to the trial court, the primary assumption of risk doctrine relieved defendant, as operator of the Rue le Dodge ride, of its duty of ordinary care to protect plaintiff, a participant on the ride, from the risk of injuries resulting from the collision or collisions that fractured her wrist.

4

## I. Application of Primary Assumption of Risk to "Nonsport" Recreational Activities

"Although persons generally owe a duty of due care not to cause an unreasonable risk of harm to others (Civ. Code, § 1714, subd. (a)), some activities—and, specifically, many sports—are inherently dangerous. Imposing a duty to mitigate those inherent dangers could alter the nature of the activity or inhibit vigorous participation." (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003.) The primary assumption of risk doctrine, a rule of limited duty, developed to avoid such a chilling effect. (*Ibid.*; *Knight v. Jewett*, *supra*, 3 Cal.4th at p. 308.) Where the doctrine applies to a recreational activity, operators, instructors and participants in the activity owe other participants only the duty not to act so as to *increase* the risk of injury over that inherent in the activity. (*Avila v. Citrus Community College Dist.* (2006) 38 Cal.4th 148, 162; *Kahn*, at p. 1004.)

The parties disagree, first, as to whether a bumper car ride is among the activities to which the doctrine of primary assumption of risk applies. Plaintiff argues the doctrine, as an exception to the general duty of ordinary care, is properly limited to certain narrow categories, one of which is active sports. Plaintiff embraces the Court of Appeal majority's assessment that "[o]n a commonsense level, we simply cannot conclude that riding in a bumper car as a passenger implicates a *sport* within any understanding of the word" and urges that we not "extend" the doctrine to apply to a bumper car ride.

Defendant maintains the doctrine of primary assumption of risk is not limited to sports and should apply to amusement park rides that involve inherent risks of injury, including bumper cars, because imposing a duty to minimize inherent risks would tend to change the nature of such rides or cause their abandonment. In defendant's view, a duty to minimize the inherent risk of injury

5

from bumper car rides would "requir[e] amusement park operators to eliminate their existing rides and to replace them with rides that are fundamentally different," contrary to the policy motivating this court's primary assumption of risk decisions, that of preventing common law tort rules from undermining Californians' recreational opportunities. For reasons explained below, we agree with defendant.

This court's seminal decision explicating and applying primary assumption of risk in the recreational context, *Knight v. Jewett*, involved a sporting activity, an informal game of touch football. (*Knight v. Jewett*, *supra*, 3 Cal.4th at p. 300 (*Knight*).) In applying the doctrine in that case, therefore, we naturally addressed its use in "the sports setting," explaining that certain dangers are often integral to "the sport itself" and that defendants generally have no duty to protect a plaintiff from "risks inherent in the sport itself." (*Id.* at p. 315.) But in outlining the doctrine generally, we used broader language, referring to "the nature of the activity or sport" (*id.* at p. 309), "a potentially dangerous activity or sport" (*id.* at p. 311), and "risks inherent in the activity or sport itself" (*ibid.*).

While our subsequent decisions applying the doctrine to recreation have, like *Knight*, involved sports,[1] two Court of Appeal decisions have found the

---

**1** See *Ford v. Gouin* (1992) 3 Cal.4th 339, 342-343 (companion case to *Knight*, applying rule to noncompetitive waterskiing); *Cheong v. Antablin* (1997) 16 Cal.4th 1063, 1065-1066 (downhill skiing); *Kahn v. East Side Union High School Dist.*, *supra*, 31 Cal.4th at pages 995-997 (instruction in competitive swimming); *Avila v. Citrus Community College Dist.*, *supra*, 38 Cal.4th at pages 160-168 (intercollegiate baseball); *Shin v. Ahn* (2007) 42 Cal.4th 482, 486 (golf).

Outside the recreation context, we have explained the "firefighter's rule" and "veterinarian's rule," precluding certain suits by workers in those occupations for the negligent creation of hazards inherent in their work, as applications of the primary assumption of risk doctrine. (See *Priebe v. Nelson* (2006) 39 Cal.4th 1112, 1122; *Neighbarger v. Irwin Industries, Inc.* (1994) 8 Cal.4th 532, 538.)

doctrine applicable to recreational activities not considered sports. (See *Amezcua v. Los Angeles Harley-Davidson, Inc.* (2011) 200 Cal.App.4th 217, 231-232 [organized, noncompetitive group motorcycle ride]; *Beninati v. Black Rock City, LLC* (2009) 175 Cal.App.4th 650, 661 [participation in fire ritual at Burning Man festival].) Other courts have reached the same result by applying a broad definition of "sport" to include physical but noncompetitive recreational activities (see *Moser v. Ratinoff* (2003) 105 Cal.App.4th 1211, 1221 [organized, noncompetitive group bicycle ride]; *Record v. Reason* (1999) 73 Cal.App.4th 472, 482 ["tubing," i.e., riding an inner tube towed by a motor boat]) or by assessing the nature of a recreational activity without attempting to classify it as a sport or nonsport (see *Ferrari v. Grand Canyon Dories* (1995) 32 Cal.App.4th 248, 253-254 [riding in commercially operated river raft].)

In contrast, a few courts have, like the appellate court below, cited the nonsport character of an activity as one ground for not bringing it within the primary assumption of risk doctrine. (*Kindrich v. Long Beach Yacht Club* (2008) 167 Cal.App.4th 1252, 1258, 1262 [passenger who broke leg jumping from boat to dock was not engaged in an active sport]; *Shannon v. Rhodes* (2001) 92 Cal.App.4th 792, 800 [boat ride on lake not a " 'sport' within any understanding of the word"]; *Bush v. Parents Without Partners* (1993) 17 Cal.App.4th 322, 328 ["recreational dancing . . . not a sport within the ambit of *Knight*"].)

We agree with the dissenting justice below, and the court in *Beninati*, that the primary assumption of risk doctrine is not limited to activities classified as sports, but applies as well to other recreational activities "involving an inherent risk of injury to voluntary participants . . . where the risk cannot be eliminated without altering the fundamental nature of the activity." (*Beninati v. Black Rock City, LLC*, *supra*, 175 Cal.App.4th at p. 658.)

7

The primary assumption of risk doctrine rests on a straightforward policy foundation:  the need to avoid chilling vigorous participation in or sponsorship of recreational activities by imposing a tort duty to eliminate or reduce the risks of harm inherent in those activities.  It operates on the premise that imposing such a legal duty "would work a basic alteration—or cause abandonment" of the activity. (*Kahn v. East Side Union High School Dist.*, *supra*, 31 Cal.4th at p. 1003; see also *Shin v. Ahn*, *supra*, 42 Cal.4th at p. 492, quoting *Dilger v. Moyles* (1997) 54 Cal.App.4th 1452, 1455 [" 'Holding [golfers] liable for missed hits would only encourage lawsuits and deter players from enjoying the sport.' "]; *Avila v. Citrus Community College Dist.*, *supra*, 38 Cal.4th at p. 165 [in baseball, recognizing tort liability for hitting the batter with a pitch would tend to deter throwing inside, an essential part of the sport]; *Ford v. Gouin*, *supra*, 3 Cal.4th at p. 345 [imposing tort liability for negligence in towing water-skier might well chill participation and "have a generally deleterious effect on the nature of the sport of waterskiing as a whole"]; *Knight*, *supra*, 3 Cal.4th at p. 318 [doctrine avoids chilling vigorous participation in sport].)  The doctrine's parameters should be drawn according to that goal.

The policy behind primary assumption of risk applies squarely to injuries from physical recreation, whether in sports or nonsport activities.  Allowing voluntary participants in an active recreational pursuit to sue other participants or sponsors for failing to eliminate or mitigate the activity's inherent risks would threaten the activity's very existence and nature.  In thus concluding, we do not "expand the doctrine to any activity with an inherent risk," as the majority below cautioned.[2]  While inherent risks exist, for example, in travel on the streets and

---

[2]    We also do not disapprove the *results* in decisions previously cited as limiting application of primary assumption of risk to sports (see *ante*, at p. 7).  The

*(footnote continued on next page)*

highways and in many workplaces, we agree with the lower court that "the primary assumption of risk doctrine in its modern, post-*Knight* construction is considerably narrower in its application." (See *Knight*, *supra*, 3 Cal.4th at pp. 311-312 [primary assumption of risk inapplicable to automobile accidents or medical negligence].) But active *recreation*, because it involves physical activity and is not essential to daily life, is particularly vulnerable to the chilling effects of potential tort liability for ordinary negligence. And participation in recreational activity, however valuable to one's health and spirit, is voluntary in a manner employment and daily transportation are not.

The doctrine thus applies to bumper car collisions, regardless of whether or not one deems bumper cars a "sport." Low-speed collisions between the padded, independently operated cars are inherent in—are the whole point of—a bumper car ride. As plaintiff agreed in her deposition: "The point of the bumper car is to bump—  [¶] . . .  [¶] You pretty much can't have a bumper car unless you have bumps." While not *highly* dangerous, such collisions, resulting in sudden changes in speed and direction, do carry an inherent risk of minor injuries, and this risk cannot be eliminated without changing the basic character of the activity. In the words of the dissenting justice below: "Imposing liability would have the likely effect of the amusement park either eliminating the ride altogether or altering its character to such a degree—by, for example, significantly decreasing the speed at which the minicars could operate—that the fun of bumping would be eliminated,

---

*(footnote continued from previous page)*

doctrine may have been inapplicable in those cases for other reasons. (See, e.g., *Shannon v. Rhodes*, *supra*, 92 Cal.App.4th at p. 800 [imposing duty of ordinary care on boat operator toward passengers does not require eliminating any inherent aspect of the activity and will not deter participation in boating].)

9

thereby discouraging patrons from riding. Indeed, who would want to ride a *tapper car* at an amusement park?"

As she did in *Knight* and several cases since, Justice Kennard dissents here from application of the primary assumption of risk doctrine. (Dis. opn. of Kennard, J., *post*, at pp. 1-2.) In light of the dissenter's consistent urging that we return to the traditional consent-based assumption of risk defense, it is worth reiterating some of the reasons given in *Knight* for abandoning that defense in favor of a limited-duty rule. (See *Knight*, *supra*, 3 Cal.4th at pp. 311-313.)[3] The traditional rule, resting on a legal fiction that the plaintiff had impliedly consented to the activity's known risks, would completely bar the plaintiff's recovery because of his or her unreasonable conduct, putting the defense in severe tension with comparative fault principles adopted in *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804. (*Knight*, at p. 311.) In theory, moreover, it could apply to risks *beyond* those inherent in the activity—even reckless or intentional misconduct, were it shown the plaintiff was aware of the potential for such misconduct—and apply as well to activities far beyond the realm of sports and recreation, such as automobile travel and medical treatment, that carry known risks of injury from others' negligence. (*Id.* at pp. 311-312.) Finally, the implied-consent theory's focus on what the individual plaintiff subjectively knew about the nature and magnitude of the risks being encountered subjected defendants to widely disparate liability for the same conduct, and made summary judgment on the basis of assumption of risk very rare, since the defense depended on proof of the particular

---

[3]    Although the cited discussion appears in a plurality opinion signed by only three justices, Justice Mosk separately expressed agreement with this part of the plurality opinion. (*Knight*, *supra*, 3 Cal.4th at p. 321 (conc. & dis. opn. of Mosk, J.).)

10

plaintiff's subjective knowledge and expectations. (*Id.* at pp. 312-313.) The dissenting opinion here does not persuade us these considerations have lost their force.

The dissent argues that the question of which risks are inherent in a recreational activity is fact-intensive and hence unsuitable for resolution as a matter of law, especially on a demurrer or a defense motion for summary judgment. (Dis. opn. of Kennard, J., *post*, at pp. 4-5.) We disagree. Judges deciding inherent risk questions under *Knight* may consider not only their own or common experience with the recreational activity involved but may also consult case law, other published materials, and documentary evidence introduced by the parties on a motion for summary judgment. (See *Avila v. Citrus Community College Dist.*, *supra*, 38 Cal.4th at pp. 163-165; *Kahn v. East Side Union High School Dist.*, *supra*, 31 Cal.4th at pp. 999, 1011-1012, 1017; cf. *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 775-776, fn. 5 [court may consult published material on legal questions, including existence of a tort duty, without formally taking judicial notice].) That deciding inherent risk may sometimes be difficult does not persuade us it is beyond the competence of California courts.

## II. Application of Primary Assumption of Risk to an Amusement Park Ride

Plaintiff, however, contends that because amusement park rides are the subject of state regulations for safety and inspection, and because operators of some rides have been considered common carriers for reward, public policy precludes applying the primary assumption of risk doctrine to amusement park rides generally, including the bumper cars on which she was injured.

11

With regard to state regulation of amusement parks, plaintiff stresses she does not claim defendant violated any applicable regulation in its operation of the Rue le Dodge ride[4] and is not arguing for a presumption of negligence under Evidence Code section 669, subdivision (a) that would preclude application here of the assumption of risk doctrine. (See generally *Cheong v. Antablin*, *supra*, 16 Cal.4th at pp. 1070-1072.) Instead, plaintiff argues "the proper focus is on what public policy is reflected in these regulations and whether that policy supports holding [defendant] legally responsible for the harm it caused [plaintiff]."

Plaintiff contends the extensive state regulations governing the design, construction, maintenance and operation of amusement park rides exist for the protection of riders' safety, demonstrating an overriding policy concern inconsistent with application of the primary assumption of risk doctrine. As the Court of Appeal majority put the argument, the policy considerations behind the doctrine, avoiding the chilling effect of tort liability on vigorous participation, "are reversed in the amusement park setting. As the regulatory scheme bears out, the concern is not to excuse possible dangerous conditions in order to increase the

---

**4**     Only three regulations appear to specifically address bumper car rides, though other regulations are no doubt applicable to bumper cars as well as other rides. California Code of Regulations, title 8, section 3907, subdivision (b) provides: "Rides that are self-powered and that are operated by passengers shall have the driving mechanism so guarded and the guards so secured in place as to prevent passengers from gaining access to the mechanism. The 'Dodge-Em' type of ride shall have the overhead screening free from holes that will catch the power conducting device and allow it to hang-up or cause a whipping action of the device." California Code of Regulations, title 8, section 3195.9 provides in subdivision (a) that "[l]ow speed vehicles designed for controlled collisions, such as bumper cars, do not require emergency stopping controls" and in subdivision (h)(6) that "[e]lectrically energized overhead screens used to power bumper car type rides shall be free of holes that are not part of the design."

12

thrill of a ride. Instead, rider safety is of paramount concern. Public policy, under the facts here, supports the imposition of a duty on amusement park owners to protect the public from the possible grave dangers of amusement park rides. (Cal. Code Regs, tit. 8, § 3900.)"[5]

We do not agree that the existence of safety regulations governing amusement park rides exempts them from the primary assumption of risk doctrine. To be sure, the assurance of relative safety from grave injury, which state regulation helps to provide, is essential to amusement parks; few would voluntarily ride a roller coaster that regularly caused serious personal injuries. But *perfect* immunity from *all* risk of even *minor* injury is not generally the goal of the amusement park rider, and the state regulations do not guarantee such complete and perfect absence of risk. As Justice Cardozo, then Chief Justice of the New York Court of Appeals, explained more than 80 years ago, the attractions of the amusement park "are not the pleasures of tranquillity." (*Murphy v. Steeplechase Amusement Co.* (1929) 250 N.Y. 479, 483.) A small degree of risk inevitably accompanies the thrill of speeding through curves and loops, defying gravity or, in bumper cars, engaging in the mock violence of low-speed collisions. Those who voluntarily join in these activities also voluntarily take on their minor inherent risks. As for the rest: "The timorous may stay at home." (*Ibid.*; see also *Gardner v. G. Howard Mitchell, Inc.* (N.J. 1931) 153 A. 607, 609 [plaintiff assumed risk of bumping on a "Dodgem" ride: "It was for the thrill of bumping and of the escape

---

**5**     The cited regulation provides that the orders governing amusement park rides "establish minimum standards for design, maintenance, construction, alteration, operation, repair, inspections, assembly, disassembly, and use of amusement rides *for the protection of persons using such rides*." (Cal. Code Regs., tit. 8, § 3900, italics added.)

13

from being bumped that plaintiff entered the contrivance . . . . The chance of a collision was that which gave zest to the game upon which plaintiff had entered. She willingly exposed herself to the contingency of a collision."].)

Plaintiff also argues the public policy of protecting passengers of a common carrier for reward, as expressed in Civil Code section 2100, precludes limiting defendant's duty to riders on Rue le Dodge.[6] In *Gomez v. Superior Court*, we held that an operator of a "roller coaster or similar amusement park ride can be a carrier of persons for reward" for purposes of Civil Code section 2100. (*Gomez v. Superior Court*, *supra*, 35 Cal.4th at p. 1136, fn. 5 (*Gomez*).) At the same time, however, we expressed no opinion "whether other, dissimilar, amusement rides or attractions can be carriers of persons for reward." (*Ibid.*)

*Gomez*'s caveat applies here. Bumper car rides like Rue le Dodge are dissimilar to roller coasters in ways that disqualify their operators as common carriers. The dissenting justice below, we believe, analyzed this point correctly: "A bumper car ride is quite different from a roller coaster. . . . A roller coaster is constrained to a track and subject to the exclusive control of the operator. Those choosing to ride a roller coaster ' "surrender[] themselves to the care and custody of the [operator]; they . . . give[] up their freedom of movement and actions . . . ." [Citation.]' (*Gomez*, *supra*, 35 Cal.4th at p. 1137.) . . . [¶] In contrast, a bumper car ride such as Rue le Dodge consists of small electric cars that operate at medium speeds around a flat surface track. . . . Cedar Fair and its employees

---

[6]    "A carrier of persons for reward must use the utmost care and diligence for their safe carriage, must provide everything necessary for that purpose, and must exercise to that end a reasonable degree of skill." (Civ. Code, § 2100.)
       Although at oral argument plaintiff's counsel suggested she does not contend defendant was a common carrier, plaintiff's answer brief states: "Dr. Nalwa maintains Cedar Fair was a common carrier when it operated Rue Le Dodge."

14

maintain and inspect the ride; set maximum speeds for the minicars; load and unload riders; activate the ride; have control over an emergency switch disabling the electricity powering the minicars; and enforce various riding instructions and safety rules. But once the ride commences, patrons exercise independent control over the steering and acceleration of the cars. Unlike roller coaster riders, they do not surrender their freedom of movement and actions. Rue le Dodge riders have control over the entertainment element of the ride, the bumping, as they determine when to turn and accelerate. [Citation.] A rider of a roller coaster has no control over the elements of thrill of the ride; the amusement park predetermines any ascents, drops, accelerations, decelerations, turns or twists of the ride."

Riders on Rue le Dodge, in other words, are not passively carried or transported from one place to another. They actively engage in a game, trying to bump others or avoid being bumped themselves. The rationale for holding the operator of a roller coaster to the duties of a common carrier for reward—that riders, having delivered themselves into the control of the operator, are owed the highest degree of care for their safety—simply does not apply to bumper car riders' safety from the risks inherent in bumping. "The rule that carriers of passengers are held to the highest degree of care is based on the recognition that ' "[t]o his diligence and fidelity are intrusted the lives and safety of large numbers of human beings." ' " (*Gomez*, *supra*, 35 Cal.4th at p. 1136.) A bumper car rider, in contrast, does not entrust the operator with his or her safety from the risks of low-speed collisions.

The undisputed facts in the summary judgment record demonstrate defendant was not a common carrier for reward in its operation of Rue le Dodge. The public policy supporting a higher duty of care for common carriers, therefore, does not apply here and does not preclude application of the primary assumption of risk doctrine.

15

### III. Defendant's Duty as Operator of the Ride

Plaintiff argues that because defendant controlled and reaped economic benefits from the operation of the Rue le Dodge ride, public policy supports holding defendant to the ordinary duty of due care with regard to its conduct of the ride. We agree that in delineating legal duty a defendant's relationship to the activity in which the plaintiff was injured is a proper consideration, but not that the relationship here makes imposition of an ordinary negligence duty appropriate.

Although the defendant in *Knight* was a coparticipant in the touch football game that led to the plaintiff's injury, in articulating the rule of limited duty we referred as well to sponsors and operators of an activity. (See *Knight*, *supra,* 3 Cal.4th at pp. 316 [ski resort operator has no duty to remove moguls from run, but does have a duty to maintain towropes in safe condition], 318 [citing decisions on duties of sports facilities owners, equipment manufacturers, instructors and coaches].) The scope of the duty owed to participants in active recreation, we explained, depends not only on the nature of the activity but also on the role of the defendant whose conduct is at issue. (*Id.* at pp. 317-318.) Our later decisions establish that under the primary assumption of risk doctrine, operators, sponsors and instructors in recreational activities posing inherent risks of injury have no duty to eliminate those risks, but do owe participants the duty not to unreasonably increase the risks of injury beyond those inherent in the activity. (*Avila v. Citrus Community College Dist.*, *supra*, 38 Cal.4th at p. 162; *Kahn v. East Side Union High School Dist.*, *supra*, 31 Cal.4th at pp. 1003, 1005.)

Plaintiff quotes the Court of Appeal majority's reasoning that a greater duty should apply to proprietors of recreational activities because they are "uniquely positioned to eliminate or minimize certain risks, and are best financially capable of absorbing the relatively small cost of doing so." As to the inherent risks of injury from recreation, we disagree. A rule imposing negligence duties on

16

sponsors, organizers and operators of recreational activities would encompass not only commercial companies like defendant but also noncommercial organizations without extensive budgets or paid staff. Such groups might not easily afford insurance to cover injuries that are inherent risks of the activity; nor could they readily collect large fees from participants to cover that cost. The primary assumption of risk doctrine helps ensure that the threat of litigation and liability does not cause such recreational activities to be abandoned or fundamentally altered in an effort to eliminate or minimize inherent risks of injury.

Finally, comparing this case to decisions addressing the duty to reduce *extrinsic* risks of an activity, plaintiff argues defendant owed her a duty to take reasonable measures to eliminate or minimize head-on bumping, which she characterizes as beyond the inherent risks of a bumper car ride.[7] Even assuming a triable issue of fact exists that plaintiff's injury resulted from a head-on collision— the record contains no direct evidence it did—we disagree. While the risks of injury from bumping bumper cars are generally low, a minor injury could occur from bumping at *any* angle. No qualitative distinction exists among the possible angles of collision, and hence no principled basis exists to impose a duty of care uniquely for 180-degree collisions. And while plaintiff points to defendant's efforts to discourage head-on bumping, such voluntary efforts at minimizing risk do not demonstrate defendant bore a legal duty to do so; not every rule imposed by an organizer or agreed to by participants in a recreational activity reflects a legal duty enforceable in tort. (*Avila v. Citrus Community College Dist.*, *supra*, 38

---

[7] Plaintiff cites *Rosencrans v. Dover Images, Ltd.* (2011) 192 Cal.App.4th 1072, 1084 (owner-operator of motocross track owed motorcyclist duty of reasonable care to avoid collisions by posting flaggers to warn of fallen riders) and *Saffro v. Elite Racing, Inc.* (2002) 98 Cal.App.4th 173, 179 (organizer of marathon had duty to provide promised adequate water and electrolytic fluids along course).

17

Cal.4th at p. 165.) Nor does defendant's operation of other bumper car rides so as to channel the cars' travel mainly in one direction establish a duty to operate Rue le Dodge in the same manner. The operator of a bumper car ride might violate its "duty to use due care not to increase the risks to a participant over and above those inherent" in the activity (*Knight*, *supra*, 3 Cal.4th at p. 316) by failing to provide routine safety measures such as seat belts, functioning bumpers and appropriate speed control, but does not do so by failing to restrict the angle of bumping.

Any attempt on our part to distinguish between angles of collision that pose inherent risks and those that pose extrinsic risks would ignore the nature of a bumper car ride, an activity that gives its mostly young participants the opportunity to inflict and evade low-speed collisions from a variety of angles.

## CONCLUSION

The risk of injuries from bumping was inherent in the Rue le Dodge ride, and under our precedents defendant had no duty of ordinary care to prevent injuries from such an inherent risk of the activity. The absence of such a duty defeats plaintiff's cause of action for negligence as a matter of law. Plaintiff's "willful misconduct" cause of action, which (as described by the lower court and in plaintiff's briefing) rests on a duty to minimize head-on collisions, fails for the same reason.[8] Finally, in light of our conclusion defendant did not act as a common carrier for reward in operating the bumper car ride, summary judgment was also proper on the cause of action for common carrier liability.

---

[8] Whether "willful misconduct" constitutes an independent cause of action or is merely an element of various claims and defenses was not decided by the Court of Appeal, identified as an issue in the petition for review, or briefed by the parties in this court. An amicus curiae brief argues forcefully against recognition of such a separate cause of action, but we decline to address the issue in this case.

## DISPOSITION

The judgment of the Court of Appeal is reversed.

**WERDEGAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**BAXTER, J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**

**DISSENTING OPINION BY KENNARD, J.**

In *Knight v. Jewett* (1992) 3 Cal.4th 296 (*Knight*), a plurality of this court introduced a radical transformation of California's tort law:  Participants in active sports are exempt from the usual tort law standard of care — as measured by the conduct of a reasonable person in like or similar circumstances — to prevent injury to coparticipants.  The only duty owed, the plurality said, is not to increase the risk of harm "inherent" in a particular sport (*id.* at pp. 315-316 (plur. opn. of George, J.)); whether a risk is inherent is a legal question to be decided by the judge before trial (*id.* at p. 313).  I dissented in *Knight*, noting the difficulty trial judges would face in pretrial proceedings, on demurrer or on a motion for summary judgment, in discerning "which risks are inherent in a given sport" (*id.* at p. 337 (dis. opn. of Kennard, J.)).  I perceived no good reason to abandon the traditional defense of assumption of risk, which pertains to a plaintiff's knowing and voluntary acceptance of the risk of injury in a particular activity.

Eleven years later, in *Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990 (*Kahn*), a majority of this court extended the reasoning of the *Knight* plurality beyond sports *participants* by applying it to a high school swim coach who *supervised and trained* sports participants.  I disagreed, for reasons similar to those expressed in my dissent in *Knight*, *supra*, 3 Cal.4th 296.  (*Kahn*, *supra*, at pp. 1021-1025 (conc. & dis. opn. of Kennard, J.).)  Since then, I have reiterated that view in two separate opinions.  (*Shin v. Ahn* (2007) 42 Cal.4th 482, 500-502

1

(conc. & dis. opn. of Kennard, J.); *Avila v. Citrus Community College Dist.* (2006) 38 Cal.4th 148, 169-174 (conc. & dis. opn. of Kennard, J.) (*Avila*).)[1]

Today the majority further expands *Knight*'s no-duty-for-sports rule, this time by bringing within the rule's ambit "recreational activities" (maj. opn., *ante*, at p. 1) (here, a bumper car ride in an amusement park), saddling trial judges with the unenviable task of determining the risks of harm that are inherent in a particular recreational activity.

# I

In 2005, plaintiff took her nine-year-old son on a bumper car ride at Great America, an amusement park in Santa Clara, California; she sat next to her son, who steered the car. The ride was "multidirectional" (cars could go in all directions). No written warnings prohibited "head-on" bumping, but riders who deliberately collided head-on were told by the ride operator to stop. Plaintiff's car

---

[1] *Knight*'s no-duty-for-sports rule has been strongly criticized in various legal journals. (See, e.g., Note, *California Supreme Court Extends Assumption of Risk to Noncontact Sports — Shin v. Ahn, 165 P.3d 581 (Cal. 2007)* (2008) 121 Harv. L.Rev. 1253, 1260 [the California Legislature should "take Justice Kennard's advice and restore traditional principles of negligence to the fore of sports torts jurisprudence"]; Ursin & Carter, *Clarifying Duty: California's No-Duty-for-Sports Regime* (2008) 45 San Diego L.Rev. 383, 440 ["the only real use of the inherent risk concept is to cause confusion"]; Comment, *Looking Beyond the Name of the Game: A Framework for Analyzing Recreational Sports Injury Cases* (2001) 34 U.C. Davis L.Rev. 1029, 1057 ["The *Knight* decision sets an unreasonable standard of care for recreational sports injury cases that violates public policy."]; Note, *Fore! American Golf Corporation v. Superior Court: The Continued Uneven Application of California's Flawed Doctrine of Assumption of Risk* (2001) 29 Western St. U. L.Rev. 125, 145-146 ["*Knight*'s vague guidelines regarding duty analysis" are "a flawed conceptualization of the doctrine of assumption of risk" that have "produced uneven results."]; Sugarman, *Judges as Tort Law Un-Makers: Recent California Experience with "New" Torts* (1999) 49 DePaul L.Rev. 455, 485 [expressing "disagreement with the policy judgment that recreational injuries are an appropriate place for such a 'no duty' rule."].)

was hit head-on and from the back in close succession.  As plaintiff put her hand on the car's dashboard to brace herself, she fractured her wrist.  She sued defendant Cedar Fair, L.P., the owner of the amusement park for, as relevant here, negligence.

At the time of the injury, defendant owned four other amusement parks.  In those parks, the bumper car rides were unidirectional (cars could only go in one direction, around an island), allowing rear-end and side collisions but minimizing the likelihood of head-on collisions.  Plaintiff here asserted that had the bumper car ride at Great America been unidirectional, the head-on collision that fractured her wrist would not have occurred.

Defendant successfully moved for summary judgment.  The trial court ruled that plaintiff could not recover on her cause of action for negligence, because under the no-duty-for-sports rule defendant had no duty to prevent the bumper cars from colliding head-on.  In a two-to-one decision the Court of Appeal reversed, holding that the no-duty-for-sports rule applies only to sports, and that a bumper car ride is not a sport.  This court granted defendant's petition for review.

**II**

Until the 1993 plurality decision in *Knight*, California had in negligence cases followed the common law doctrine of assumption of risk, a defense to liability for injuries resulting from "a specific, known and appreciated risk" to which the plaintiff had voluntarily consented.  (*Knight*, *supra*, 3 Cal.4th at p. 325 (dis. opn. of Kennard, J.).)  The consent could be express (through a plaintiff's spoken or written words) or implied (inferred from the plaintiff's conduct).  (*Ibid*.)  The plurality in *Knight* proposed that, for injuries occurring during active sports, the assumption of risk doctrine be replaced with a rule that the *Knight* plurality called " 'primary assumption of risk' " (*Knight*, *supra*, at p. 310 (plur. opn. of George, J.)) and which I have called the "no-duty-for-sports rule" (e.g., *Knight*,

3

*supra*, at p. 336 (dis. opn. of Kennard, J.)). A majority of this court later embraced the *Knight* rule. (See *Cheong v. Antablin* (1997) 16 Cal.4th 1063, 1067; *Kahn*, *supra*, 31 Cal.4th at pp. 995-996.)

Common law assumption of the risk was an affirmative defense to be asserted and proved by the defendant at trial. Duty, by contrast, is a question of law to be determined by the trial court before trial, on demurrer or on a motion for summary judgment. The no-duty-for-sports rule reduces the traditional standard of care — measured by the conduct of a reasonable person in like or similar circumstances — by imposing on all those involved in sports activities (participants, coaches, and hosts of sporting events) only the duty to avoid increasing the danger beyond the risks that are "inherent" in the sport. Whether the plaintiff knowingly assumed the risk of injury no longer matters. As my dissent in *Knight* explained, the no-duty-for-sports rule "recast the analysis of implied assumption of risk from a subjective evaluation of what a particular plaintiff knew and appreciated about the encountered risk into a determination of the presence or absence of duty legally imposed on the defendant . . . [,] thus transforming an affirmative defense into an element of the plaintiff's negligence action." (*Knight*, *supra*, 3 Cal.4th at p. 324 (dis. opn. of Kennard, J.).) Consequently, the rule "eliminate[d] altogether the 'reasonable person' standard as the measure of duty actually owed" (*id.* at p. 325) by those involved in sports activities.

In an action seeking damages for a personal injury sustained while playing a sport, determining which risks are inherent in that sport is a difficult task. Some sports are so new or uncommon that their typical risks may not be evident. Even for sports that are familiar and widely played, moreover, the risks of physical injury to players of that sport are likely to vary greatly depending on, for example, the participants' ages and genders, their levels of skill and experience, and the

4

presence or absence of protective clothing and equipment.  Because of the many variables, the "inherent risk" determination is often fact-intensive and ill-suited for treatment as a question of law, which a trial court must decide without the benefit of an evidentiary hearing.  The difficulties that trial courts will encounter when making these "inherent risk" determinations are greatly amplified by today's decision expanding the no-duty-for-sports rule to also encompass recreational activities that are not sports.

The majority gives this reason for applying the no-duty-for-sports rule to recreational activities:  "[A]ctive *recreation*, because it involves physical activity and is not essential to daily life, is particularly vulnerable to the chilling effects of potential tort liability for ordinary negligence." (Maj. opn., *ante*, at p. 9.)  The majority later asserts:  "The primary assumption of risk doctrine helps ensure that the threat of litigation and liability does not cause such recreational activities to be abandoned or fundamentally altered in an effort to eliminate or minimize inherent risks of injury." (*Id.* at p. 17.)  But the majority offers no evidence for that view.  Pertinent here is this comment by a major treatise on tort law:  "It may be that some courts are in the process of creating a freestanding limited-duty rule, divorced from its foundation in the parties' expectations.  The opinions suggest that the duty should be limited because of the danger of a flood of litigation, and because of a supposed policy of encouraging vigorous physical competition.  Both these reasons, as distinct from the parties' reasonable expectations, may be doubted." (1 Dobbs et al., The Law of Torts (2d ed. 2011), § 240, p. 868, fns. omitted.)

A final point:  Even if the common law assumption of risk doctrine were still in place in California (see pp. 3-4, *ante*), plaintiff here would not necessarily prevail in her action for personal injury.  Under that doctrine, "the pertinent inquiry is not what risk is inherent in a particular sport [or recreational activity];

5

rather, it is what risk the plaintiff consciously and voluntarily assumed." (*Avila*, *supra*, 38 Cal.4th at p. 173 (conc. & dis. opn. of Kennard, J.).) Thus, the question here would be whether plaintiff voluntarily assumed the risk of the type of harm that ensued from her decision to ride the bumper car, "with knowledge and appreciation of that risk." (*Knight*, *supra*, 3 Cal.4th at p. 326 (dis. opn. of Kennard, J.).) Even if plaintiff did not assume that risk, defendant may not have acted unreasonably by making the bumper car ride at Great America a multidirectional ride, and thus may not have breached its duty of care toward plaintiff. According to declarations in the appellate record, approximately 300,000 people rode on that ride in 2005, the year plaintiff was injured, and she was the only one to suffer a fracture. Based on such evidence, a jury could conclude that defendant was not negligent.

Because, for the reasons given above, I agree with the Court of Appeal that the no-duty-for-sports rule should not be extended to a bumper car ride, which the Court of Appeal observed is not a sport, I would affirm its judgment reversing the trial court's grant of defendant's summary judgment motion.


KENNARD, J.

6

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Nalwa v. Cedar Fair, L.P.
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 196 Cal.App.4th 566
**Rehearing Granted**

_____

**Opinion No.** S195031
**Date Filed:** December 31, 2012
_____

**Court:** Superior
**County:** Santa Clara
**Judge:** James P. Kleinberg

_____

**Counsel:**

Law Offices of Ardell Johnson, Ardell Johnson; Christi Jo Elkin; Emanuel Law Group and Mark D. Rosenberg for Plaintiff and Appellant.

Manning & Kass, Ellrod, Ramirez, Trester, Patrick L. Hurley, Jeffrey M. Lenkov and Stephen J. Renick for Defendant and Respondent.

Duane Morris, John E. Fagan, Paul J. Killion and Jill Penwarden for California Ski Industry Association and National Ski Areas Association as Amici Curiae on behalf of Defendant and Respondent.

Prindle, Amaro, Goetz, Hillyard, Barnes & Reinholt and Michael L. Amaro for Park Management Corp. doing business as Six Flags Discovery Kingdom, Magic Mountain LLC, LEGOLAND California LLC, Agua Caliente, Bally Total Fitness Corporation, 24 Hour Fitness, GNS Development Corporation doing business as Golf N' Stuff, Montasia LP, Butler Amusements, Inc., Christensen Amusements, Carnival Midway Attractions, Brass Ring Amusements, Inc., Davis Enterprises and Amusements, Northridge Skateland Enterprises, The Worldwide Outfitters and Guides Association, International Special Events and Recreation Association and Scooters Jungle as Amici Curiae on behalf of Defendant and Respondent.

Snell & Wilmer, Mary-Christine Sungaila and Jessica E. Yates for California Chamber of Commerce as Amicus Curiae on behalf of Defendant and Respondent.

David J. Ozeran as Amicus Curiae on behalf of Defendant and Respondent.

Horvitz & Levy, Frederic D. Cohen and Wesley T. Shih for California Attractions and Parks Association as Amicus Curiae on behalf of Defendant and Respondent.

Gordon & Rees, Don Willenburg; Cole Pedroza and Joshua C. Traver for Association of Defense Counsel of Northern California and Nevada and Association of Southern Defense Counsel as Amici Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Mark D. Rosenberg
Emanuel Law Group
702 Marshall Street, Suite 400
Redwood City, CA 94063
(650) 369-8900

Jeffrey M. Lenkov
Manning & Kass, Ellrod, Ramirez, Trester
801 South Figueroa Street, 15th Floor
Los Angeles, CA 90017
(213) 624-6900

Stephen J. Renick
Manning & Kass, Ellrod, Ramirez, Trester
801 South Figueroa Street, 15th Floor
Los Angeles, CA 90017
(213) 624-6900